**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RICHARD THOMAS STITT, a/k/a
Patrick V. Hardy, a/k/a Tom Tom,

*Defendant-Appellant.*

No. 07-11

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

RICHARD THOMAS STITT, a/k/a
Patrick V. Hardy, a/k/a Tom Tom,

*Defendant-Appellee.*

No. 07-12

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(2:98-cr-00047-JBF)

Argued: September 24, 2008

Decided: December 24, 2008

Before WILLIAMS, Chief Judge, and MOTZ
and SHEDD, Circuit Judges.

2          UNITED STATES V. STITT

Affirmed in part; reversed and remanded in part with instructions by published opinion. Chief Judge Williams wrote the opinion, in which Judge Motz and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** Gerald Thomas Zerkin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Richard Thomas Stitt. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for the United States. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia; Amy L. Austin, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia; Jeffrey L. Stredler, WILLIAMS MULLEN, Norfolk, Virginia, for Richard Thomas Stitt. Chuck Rosenberg, United States Attorney, Alexandria, Virginia; Darryl J. Mitchell, Assistant United States Attorney, William D. Muhr, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for the United States.

---

**OPINION**

WILLIAMS, Chief Judge:

We granted Richard Thomas Stitt, a federal inmate, a certificate of appealability ("COA") to consider his claim that during the guilt phase of his federal capital proceeding, his trial counsel labored under a conflict of interest that adversely affected his representation. By way of cross-appeal, the Government argues that the district court, after granting Stitt relief under 28 U.S.C.A. § 2255 (West Supp. 2008) as to the penalty phase of his trial and vacating his death sentence, erred by concluding that Stitt was no longer eligible for the death penalty because the statute under which Stitt's death sentence

was imposed has since been repealed, *see* 21 U.S.C.A. § 848(g) (West 1999) (repealed 2006), and by sentencing Stitt to life imprisonment. We agree with the district court that Stitt is not entitled to relief as to his guilt-phase conflict of interest claim, but we conclude that the district court erred by finding that § 848(g) was not saved by the general Savings Statute, 1 U.S.C.A. § 109 (West 2005). Accordingly, we vacate Stitt's life sentence and remand the case for a new sentencing hearing.

I.

In 1998, a jury sitting in the Eastern District of Virginia convicted Stitt of three counts of murder during a continuing criminal enterprise, in violation of 21 U.S.C.A. § 848, as well as numerous other federal drug and firearms offenses in Virginia and North Carolina.[1] *See United States v. Stitt*("*Stitt I*"), 250 F.3d 878, 881-82 (4th Cir. 2001). Following a penalty phase conducted pursuant to § 848(g), the jury recommended a death sentence for each of the murders, and the district court sentenced Stitt to death plus 780 months imprisonment. We affirmed Stitt's conviction and sentence on direct appeal. *Stitt I*, 250 F.3d at 900.

On May 12, 2003, Stitt filed a timely motion under 28 U.S.C.A. § 2255 to vacate his conviction and sentence. In his § 2255 motion, Stitt raised two claims relevant to the current appeal. First, Stitt contended that his trial counsel, Norman Malinski, labored under a conflict of interest at the guilt phase of Stitt's trial. Specifically, Stitt claimed that Malinski failed to conduct an investigation or hire appropriate experts to

---

[1]Stitt was tried jointly with Kermit Brown, Robert Mann, and Percell Davis. The trial lasted almost two months and established that Stitt was the leader of a drug organization responsible for distributing more than 150 kilograms of crack cocaine in Portsmouth, Virginia and Raleigh, North Carolina from 1990 to 1998. The three murder charges were based upon the killings of James Griffin, Sinclair Simon Jr., and James Gilliam, Jr., all of which occurred in Virginia.

investigate the alleged criminal acts that occurred in North Carolina. Stitt claimed that Malinski failed to do so because, under the fee agreement between him and Malinksi, any expense payments were to come from the retainer paid to Malinski, and Malinski wanted to keep that money. Second, Stitt argued that Malinski was likewise under a conflict of interest during the penalty phase of Stitt's trial. This claim focused on Malinski's decision to hire an "expert" on future dangerousness whose only knowledge of federal prisons came from watching a television program. Stitt argued that Malinski hired this "expert" instead of asking the district court to appoint an expert in order to keep the district court from delving into Malinski's fee agreement with Stitt.[2]

Following two evidentiary hearings, the district court entered an order denying all of Stitt's claims except the claim that Stitt had been denied his right to conflict-free counsel during the penalty phase of his trial. *Stitt v. United States* ("*Stitt II*"), 369 F. Supp. 2d 679 (E.D. Va. 2005). Accordingly, the district court vacated Stitt's death sentence. Both sides appealed. We granted Stitt a COA on a single claim—whether Malinski had an actual conflict of interest at the guilt phase. We initially affirmed the district court's denial of relief as to Stitt's guilt-phase conflict of interest claim and its grant of relief as to his penalty-phase conflict of interest claim. *United States v. Stitt* ("*Stitt III*"), 441 F.3d 297 (4th Cir. 2006). Prior to the issuance of our mandate, however, we withdrew our opinion in *Stitt III*, concluding that we lacked jurisdiction to hear the appeal because "there is no final judgment 'until the prisoners are resentenced.'" *United States v. Stitt* ("*Stitt IV*"), 459 F.3d 483, 485 (4th Cir. 2006) (quoting

---

[2]Indeed, the financing arrangement between Malinski and Stitt remains shrouded in mystery to this day. During trial, the Government contended that Malinski received more than $500,000 in drug money to defend Stitt. While Malinski contested the Government on this point, during the evidentiary hearings he was unable to verify how much he was paid or who paid him to represent Stitt.

*Andrews v. United States*, 373 U.S. 334, 340 (1963)). We remanded the case to the district court with instructions to resentence Stitt.

On remand, the district court *sua sponte* entered an order requesting the parties to brief the following question:

> Although 21 U.S.C. § 848(i)(1) contemplates the impaneling of a new jury for the purpose of a capital resentencing, can this Court exercise its "broad and flexible § 2255 remedial power," *United States v. Hillary*, 106 F.3d 1170, 1172 (4th Cir. 1997), to "correct the sentence as may appear appropriate," 28 U.S.C. § 2255, and resentence Petitioner without application of the Death Penalty.

(J.A. at 1774.)

Following briefing, the district court answered its question in the affirmative and declined to empanel a new sentencing jury for the penalty phase, concluding that Stitt was no longer statutorily eligible for the death penalty. The district court reached this conclusion after finding that § 848(g), which had been repealed during the pendency of Stitt's appeals, could no longer apply to Stitt and that the Federal Death Penalty Act, 18 U.S.C.A. § 3591 *et seq.* ("FDPA"), did not provide a mechanism for empanelling a new sentencing jury. *Stitt v. United States* ("*Stitt V*"), 475 F. Supp. 2d 571 (E.D. Va. 2007). In the alternative, the district court concluded that, even if it had the statutory authority to call a new sentencing jury, it would exercise its discretion under § 2255 and decline to do so. *Id.* at 576. Accordingly, the district court, from the bench, resentenced Stitt to life imprisonment plus 780 months.

Both Stitt and the Government filed timely appeals. Pursuant to *United States v. Hadden*, 475 F.3d 652 (4th Cir. 2007),[3]

---

[3]In *United States v. Hadden*, 475 F.3d 652 (4th Cir. 2007), we explained:

Stitt requested a COA from this court on two issues: whether Malinski labored under an actual conflict of interest during the guilt-phase of the trial that adversely affected his representation and whether Stitt was denied his right to learned counsel. By order dated June 12, 2008, we granted Stitt a COA on his conflict of interest claim.

Meanwhile, in its appeal, the Government no longer contests the district court's decision to grant Stitt relief as to his claim that Malinski labored under a conflict of interest during the penalty phase. Instead, the Government confines its appeal to whether the district court's resentencing decision was error. We possess jurisdiction over the Government's appeal pursuant to 18 U.S.C.A. § 3742(b) (West 2000) and 28 U.S.C.A. § 1291 (West 2006).

## II.

### A.

We first address Stitt's claim that Malinski had an actual conflict of interest during the guilt phase of Stitt's trial that

---

Because a § 2255 resentencing or correction of the prisoner's sentence thus bears traits of both a § 2255 proceeding and a criminal action, we conclude that an order entering the result of such a resentencing or an order correcting the prisoner's sentence is a hybrid order that is both part of the petitioner's § 2255 proceeding and part of his criminal case.

*Id.* at 664.

Thus, "[t]o the extent the order formally completes the prisoner's § 2255 proceeding, it is part of that proceeding, and, accordingly, a prisoner's appeal of that aspect of the order is an appeal of a § 2255 proceeding." *Id.* And, before we can entertain that appeal, the prisoner "must obtain a COA under § 2253." *Id.* But, "[t]o the extent the order vacates the original sentence and enters a new criminal sentence . . . the order is part of the petitioner's criminal case." *Id.* Thus, under *Hadden*, Stitt's appeal is part of his § 2255 proceeding, while the Government's appeal is part of Stitt's original criminal case.

adversely affected his representation. We review the district court's legal conclusions in denying a § 2255 motion *de novo*. *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). Where the district court held an evidentiary hearing prior to its ruling, we review its findings of fact for clear error. *United States v. Roane*, 378 F.3d 382, 395 (4th Cir. 2004).

Generally, in order to show ineffective assistance of counsel, Stitt would be required to meet the familiar two-part *Strickland* test: (1) that his lawyer afforded him defective representation; and (2) that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). But, when counsel is burdened by an actual conflict of interest, he "breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Id.* at 692. In such cases, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Id.* Because of this difficulty in measuring prejudice and the seriousness of a conflict of interest, "[p]rejudice is presumed . . . if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980)) (internal quotation marks omitted).

Thus, in order to fall within the *Sullivan* presumption, we have explained that a defendant must demonstrate "an actual conflict of interest" that "result[s] in an adverse effect on counsel's performance." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991) (emphasis omitted). These requirements "are often intertwined." *Id.* But, an "[a]dverse effect cannot be presumed from the mere existence of a conflict of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002). Only if Stitt can meet these two requirements does he qualify

for *Sullivan*'s presumption of prejudice. *See Sullivan*, 446 U.S. at 348-49; *Rubin*, 292 F.3d at 401-02.

B.

Stitt's claim before us is that Malinski labored under a financial conflict of interest that kept him from retaining investigators in North Carolina during the guilt phase of Stitt's trial. In particular, Stitt contends that, under the financial agreement between him and Malinski, Malinski was required to pay for all case-related expenses out of his own pocket and that Malinski, not wishing to incur the costs of an out-of-state investigator, thus declined to pursue any investigation in North Carolina.

Stitt's claim raises an intriguing procedural point; in *Stitt III*, we granted Stitt a COA on this claim but denied relief, concluding that Stitt could show neither an actual conflict nor an adverse effect. *Stitt III*, 441 F.3d at 305-06. Although we later vacated that opinion, *see Stitt IV*, 459 F.3d at 484, we did not purport to question the reasoning we used in denying Stitt's claim.

In an effort to avoid our conclusion in *Stitt III*, Stitt has brought forth evidence that an investigation in North Carolina would have been a reasonable choice. In particular, Stitt argues that Count One of the indictment against him, which alleged a conspiracy to distribute in excess of 50 grams of crack, in violation of 21 U.S.C.A. § 841(a)(1) (West 1999) and 18 U.S.C.A. § 2 (West 2000), listed 48 overt acts occurring in North Carolina. Likewise, Stitt argues, two key Government witnesses, Marcus Reid and Sadat Muhammad, testified extensively and almost exclusively about Stitt's drug operations in North Carolina.

Even were we to assume, however, that Stitt's evidence on this point satisfies the "adverse effect" prong of *Sullivan*,[4] Stitt

---

[4]To establish the existence of an adverse effect, a defendant must satisfy a three-part test:

has still failed to rebut the district court's explicit factual finding that "there is no indication that the money Malinski received for his representation was directly correlated to money that would be paid for experts or other fees and costs." *Stitt II*, 369 F. Supp. 2d at 692. The district court expressly found that Malinski and co-counsel Franklin Schwartz "were paid flat fees for their services, with costs and expenses to be paid as they arose. . . . Petitioner's family agreed to raise the money for any additional costs and expenses." *Id.* at 691. Stitt contends, as he did previously, that this factual finding is clearly erroneous given that the district court also found "Malinski was evasive and not credible in answering questions about the source of the funds, his expenditures, and his record-keeping." *Id.* at 692. As Judge Motz succinctly wrote for this court in our later-withdrawn opinion in *Stitt III*,

> This finding does not contradict the district court's further finding that Malinski was not credible in some respects; it simply evidences that the district court found Malinski credible as to some issues, but not others.

*Stitt II*, 441 F.3d at 306.

We believe this reasoning remains applicable today and, accordingly, we cannot find that the district court clearly erred

---

First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. . . . Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd*, 535 U.S. 162 (2002).

in accepting Malinski's explanation as to the source of his funding during the guilt phase. With this factual finding in place, Stitt cannot show an "actual conflict," and we therefore affirm the district court's denial of this claim.

### III.

In its cross-appeal, the Government contends that the district court committed reversible error in refusing to empanel a new sentencing jury for Stitt after it granted him relief on his penalty-phase conflict of interest claim. The Government's cross-appeal involves questions of law, which we review *de novo*. *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008). In declining to empanel a new sentencing jury, the district court first concluded that it lacked the statutory authority to do so before further concluding that, even if such authority existed, it would use its broad equitable powers under § 2255 to resentence Stitt without a jury.

Thus, the Government points to what it believes are two statutes authorizing the empanelment of a new sentencing jury for Stitt, § 848(g) and the FDPA, 18 U.S.C.A. § 3593(c). The Government further contends that, under § 2255, the district court was not permitted to resentence Stitt without calling a new sentencing jury. We address each contention in turn.

### A.

### i.

When Stitt was initially sentenced to death in 1998, his death sentence was authorized by 21 U.S.C.A. § 848(e)(1)(C), which provides "any person engaging in or working in furtherance of a continuing criminal enterprise ("CCE"), . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results . . . may be sentenced to death." Section 848(g) provided that "[a] person shall be subjected to the penalty of

death for any offense under this section only if a hearing is held in accordance with this section." Section 848(i)(1) authorized a sentencing hearing, providing that, if the Government filed its notice of intent to seek the death penalty and a defendant was found guilty under subsection (e), "the judge who presided at the trial . . . shall conduct a separate sentencing hearing to determine the punishment to be imposed." 21 U.S.C.A. § 848(i)(1). The statute further provided that the sentencing hearing "shall" take place "before the jury which determined the defendant's guilt." § 848(i)(1)(A). Stitt's initial sentencing hearing was conducted in accordance with the remainder of § 848.

In 2006, however, prior to Stitt's resentencing, §§ 848(g)-(r) were repealed by Congress and § 848(e) offenses were made death penalty eligible in accordance with the FDPA. *See* Pub. L. 109-177, 120 Stat. 231, 232. *See also* 18 U.S.C.A. § 3591(a) (noting a "defendant who has been found guilty of . . . any other offense for which a sentence of death is provided" is to have a hearing held under § 3593 to determine whether imposition of a death sentence is proper).

Section 3593 further provides that, subject to several enumerated exceptions, when a defendant is found guilty of a capital offense a separate penalty hearing "shall be conducted" before the jury that determined the defendant's guilt. The exceptions are in cases where: (A) the defendant pled guilty; (B) the defendant was convicted at a bench trial; (C) "the jury that determined the defendant's guilt was discharged for good cause;" or (D) "after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary." 18 U.S.C.A. § 3593(b)(1)-(2).

The Government first argues that Stitt may be resentenced by a new capital sentencing jury under § 3593(b)(2)(D).[5] We

---

[5]At oral argument, the Government also pressed 18 U.S.C.A. § 3593(b)(2)(C), which permits the calling of a new jury for sentencing when the first was excused for "good cause," as authorizing a new sentencing jury for Stitt. The Government did not fully develop this argument in its brief, however, and we decline to address it.

disagree. Subparagraph (D), by its clear terms, permits a second sentencing jury only when the initial sentence was imposed "under this section." Stitt's original sentencing hearing was conducted under § 848, not the FDPA. However broadly one reads the phrase "under this section," it plainly cannot be read to encompass a sentence imposed under § 848, which appears in a different Title of the United States Code. We are not permitted to ignore the statute's plain language. *See Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 308 (4th Cir. 2000) *aff'd*, 534 U.S. 438 (2002) ("[E]ven if . . . the literal text of the statute produces a result that is, arguably, somewhat anomalous—we are not simply free to ignore unambiguous language because we can imagine a preferable version."). Accordingly, we agree with the district court that § 3593(b)(2)(D) did not authorize the empanelling of a new sentencing jury in this case.

ii.

We thus turn to the Government's alternative argument, that §§ 848(g)-(r) are saved against Stitt and authorize convening a second sentencing jury. In particular, the Government contends that, because § 848(e) maintained death eligibility for defendants like Stitt, it would be anomalous to conclude that there are no statutory mechanisms for holding a new capital sentencing proceeding. In contrast, Stitt argues that, as the district court concluded, the Savings Statute saves only substance, not procedures like those encompassed in § 848.

The Savings Statute, 1 U.S.C.A. § 109, provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution

for the enforcement of such penalty, forfeiture, or
liability.

1 U.S.C.A. § 109.

Originally passed in 1871, the statute serves to undo the
common law rule of abatement. As the Supreme Court has
explained:

> At common law, the repeal of a criminal statute
> abated all prosecutions which had not reached final
> disposition in the highest court authorized to review
> them. Abatement by repeal included a statute's
> repeal and re-enactment with different penalties.
> And the rule applied even when the penalty was
> reduced.

*Bradley v. United States*, 410 U.S. 605, 607-08, 93 S.Ct. 1151
(1973) (citations omitted). In order to avoid this common law
rule, "often the product of legislative inadvertence," Congress
enacted the Savings Statute. *Warden, Lewisburg Penitentiary
v. Marrero*, 417 U.S. 653, 660 (1974). The *Marrero* Court
explained that the Savings Statute "does not ordinarily pre-
serve discarded remedies or procedures," just the penalties,
liability, and forfeitures—the "punishment" of the prior stat-
ute. *Id.* at 661-62. Thus, the *Marrero* Court held that a "no-
parole provision" in a federal drug statute was "an element of
. . . punishment" saved by § 109. *Id.* at 662. As *Marrero* sug-
gests, courts have generally understood § 109 to save "merely
substantive rights and liabilities," but not "remedies" or "pro-
cedure." *United States v. Obermeier*, 186 F.2d 243, 254-55
(2d Cir. 1950).

Consistent with *Marrero*, we have explained that, under the
Savings Statute, "a liability that arises under a later-repealed
statute is preserved despite repeal and may be enforced by a
post-repeal action." *Korshin v. Comm'r*, 91 F.3d 670, 673 (4th
Cir. 1996). *See also United States v. Brown*, 429 F.2d 566

(5th Cir. 1970) ("[P]enalties accruing while a statute was in force may be prosecuted after its repeal"). For example, in *United States v. Cook*, 890 F.2d 672, 675-76 (4th Cir. 1989), we followed the logic of *Marrero* to hold that a later-repealed "no probation" provision in a federal drug statute was saved because "probation, if imposed, must be imposed as part of the sentence pronounced at the sentencing hearing, [and accordingly] it is included within the definition of 'any penalty.'" *Id.* at 676. Summarizing, we explained that because probation was not available as a sentencing option at the time Cook committed her crime, "section 109 prevents a statutory change in offense classification that occurs between the time of the violation and subsequent sentencing from making probation an available penalty at sentencing." *Id.*

Accordingly, we followed our earlier pronouncement "that the term 'penalty' in section 109 'embraces . . . the *sentence* imposed by the court.'" *Id.* (quotation marks omitted) (emphasis added). Likewise, other courts have indicated that "sentencing is an integral part of the 'prosecution' of the accused, as that term is used in § 109, and therefore that *§ 109 saves sentencing provisions* in addition to substantive laws." *United States v. Smith*, 354 F.3d 171, 175 (2d Cir. 2003) (emphasis added).

In a similar vein, the Supreme Court has explained, in saving a later-repealed statute, that:

> [W]here the object of Congress was to destroy rights in the future while saving those which have accrued, to strike down enforcing provisions that have special relation to the accrued right and as such are part and parcel of it, is to mutilate that right and hence to defeat rather than further the legislative purpose.

*De La Rama S S Co. v. United States*, 344 U.S. 386, 390 (1953).

The Court reasoned that "[l]egal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." *Id.* at 390 (quoting *The Western Maid*, 257 U.S. 419, 433 (1922)). The *De La Rama* Court further noted that when considering "the repeal of statutes which create rights and also prescribe how the rights are to be vindicated," terms like "substantive and procedural are not disparate categories; they are fused components of the expression of a policy." *De La Rama*, 344 U.S. at 390. Thus, in that case, "the right created by the repealed statute and the procedure for enforcing that right were so bound together that section 109 could not fully preserve the right without also preserving the procedure." *Barthelemy v. J. Ray McDermott & Co.*, 537 F.2d 168, 172 (5th Cir. 1976).

We think that this case law leads inexorably to the conclusion that §§ 848(g)-(r) are saved by the Savings Statute. First, as noted, courts are in agreement that "sentencing provisions" are saved as part of the "prosecution" of a "penalty" even when a later change alters the availability of a particular sentence. Thus, in *Cook*, we continued to apply the original sentencing options even though a change in offense classification created new alternatives at Cook's resentencing. Likewise, in this case we continue to apply the original sentencing provisions because the repeal of §§ 848(g)-(r) would have the effect of eliminating a previously-available sentencing option, a death sentence, at the resentencing.

Second, and perhaps more importantly, just like in *De La Rama*, the penalty provided in § 848(e) cannot be fully preserved without also preserving the mechanisms for enforcing it, §§ 848(g)-(r). Indeed, the repealed portions of § 848 are a constitutionally required condition precedent to imposing § 848(e)'s penalty of a death sentence. *See*, *e.g.*, *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (noting that the Sixth Amendment requires aggravating circumstances be proven to jury because they "operate as the functional equivalent of an element of a greater offense"); *Maynard v. Cartwright*, 486 U.S.

16                    UNITED STATES v. STITT

356, 362 (1988) ("[O]ur cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action."). This constitutional mandate, derived from the fact that "death is different," indicates that in cases involving capital sentencing, the procedures attendant to that capital sentencing are part of the "penalty" saved by the general Savings Statute because, without these procedures, that penalty is extinguished as a matter of constitutional law. *Ring*, 536 U.S. at 606.

Accordingly, because the "enforcing provisions" of § 848(g)-(r) are both akin to a "sentencing provision" and also have a constitutionally mandated "special relation to the accrued right," the Savings Statute operates to save them against Stitt. And, § 848(i)(1)(B)(iv) provided for the empanelling of a sentencing jury in cases where the original death sentence was later vacated. Thus, the district court erred by concluding that it lacked the statutory authority to convene a new sentencing jury.

B.

In the alternative, the district court concluded that, even assuming it possessed statutory authority to convene a new penalty-phase jury for Stitt, it would use its equitable § 2255 powers and decline to do so. The operative provision of § 2255 provides as follows:

> If the court finds . . . there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C.A. § 2255(b).

This language "confers a 'broad and flexible' power to the district courts 'to fashion an appropriate remedy.'" *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir. 1997) (quoting *United States v. Garcia*, 956 F.2d 41, 45 (4th Cir. 1992)). The "most appropriate remedy," we have explained, "is to put § 2255 defendants in the same boat as direct appellants, i.e., to permit resentencing." *Id.* at 1172. "[T]he defendant may be 'placed in exactly the same position in which he would have been had there been no error in the first instance.'" *Id.* at 1172 (quoting *United States v. Silvers*, 90 F.3d 95, 99 (4th Cir. 1996)).

We review a district court's use of its equitable powers under § 2255 for abuse of discretion, focusing upon whether the district court's choice was "appropriate." *Id.* Although we recognize the broad discretion the district court possesses in crafting a remedy under § 2255, we must find that it abused that discretion in this case. Section 848(i) provided that, if the Government files the appropriate death-eligibility notice (which it did in 1998), and if the defendant is found guilty of the death eligible offenses (which Stitt was in 1999), then "the judge who presided at the trial . . . *shall* conduct a separate hearing to determine the punishment to be imposed." 21 U.S.C.A. § 848(i)(1) (emphasis added). That hearing "*shall*" be conducted "before a jury impaneled for the purpose of the hearing if . . . after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary." 21 U.S.C.A. § 848(i)(1)(B)(iv) (emphasis added). And, if a jury recommends a sentence of death, "the court *shall* sentence the defendant to death." 21 U.S.C.A. § 848(l) (emphasis added). Given the repeated use of the term "shall," we believe it was not "appropriate" for the district court to forego empanelling a new penalty-phase jury.

The district court's decision also conflicts with our admonition that the defendant be placed in the "same position" as if

there was no error. In this case, that position would be await-ing a penalty phase after having been convicted of death-eligible offenses. The district court's justification, the time between the initial death penalty hearing and the resentencing, fails to recognize that Congress, by providing in § 848(i) that a second penalty phase "shall" be held when the original death sentence is later overturned, has already legislatively addressed that concern.

## IV.

The decision of the district court denying Stitt habeas relief as to his guilt-phase claims is affirmed. Because, however, the Savings Statute saves § 848(g), we believe the district court's decision to sentence Stitt to life imprisonment plus 780 months without calling a new sentencing jury must be reversed, and we remand the case for a new capital sentencing hearing conducted pursuant to § 848(g).

*AFFIRMED IN PART; REVERSED AND*
*REMANDED IN PART WITH INSTRUCTIONS*